```
                    UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF TEXAS (CORPUS CHRISTI)

UNITED STATES OF AMERICA,      .
                               .  Case No. 2:21-cr-01079-1
               Plaintiff,      .
                               .
      v.                       .
                               .
HAYDEN MICHAEL ESPINOSA,       .  1133 N. Shoreline Blvd.
                               .  Corpus Christi, TX 78401
               Defendant.      .
                               .  Monday, December 19, 2022
. . . . . . . . . . . . . . . .  3:53 p.m.
```

TRANSCRIPT OF SENTENCING HEARING
            BEFORE THE HONORABLE DAVID S. MORALES
             UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:        U.S. Attorney's Office
                          By:  JOEL STACEY DUNN, ESQ.
                          800 North Shoreline Boulevard
                          Suite 500
                          Corpus Christi, TX 78401
                          (361) 888-3111


For the Defendant:        SIMON BRIAN PURNELL, ESQ.
                          615 North Upper Broadway, Suite 900
                          Corpus Christi, TX 78401
                          (361) 500-2804


Also Present:             RENE GARCIA
                          Probation



Audio Operator:           Nina Avila, ECR


Transcription Company:    Access Transcripts, LLC
                          10110 Youngwood Lane
                          Fishers, IN 46048
                          (855) 873-2223
                          www.accesstranscripts.com



     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1        (Proceedings commence at 3:53 p.m.)

2        THE CLERK:  The Court calls C21-1079 United States

3   v. Hayden Espinosa.  May I have appearances by counsel and

4   probation.

5        MR. DUNN:  Joel Dunn on behalf of the United States.

6   Good afternoon.

7        THE COURT:  Good afternoon.

8        MR. PURNELL:  Simon Purnell on behalf of

9   Mr. Espinosa.  Good afternoon, Your Honor.

10        THE COURT:  Good afternoon.

11        MR. GARCIA:  Rene Garcia for Probation.

12        THE COURT:  Thank you.

13        THE CLERK:  Mr. Espinosa, would you raise your right

14   hand?

15             HAYDEN ESPINOSA, DEFENDANT, SWORN

16        THE CLERK:  Thank you.

17        THE COURT:  Good afternoon, Mr. Espinosa.

18        THE DEFENDANT:  Good afternoon.

19        THE COURT:  Can you state your full name please?

20        THE DEFENDANT:  Hayden Michael Espinosa.

21        THE COURT:  And, Mr. Espinosa, you understand we're

22   here today for your sentencing?

23        THE DEFENDANT:  Yes, sir.

24        THE COURT:  On September the 29th of this year, you

25   entered a plea of guilty in front of Magistrate Judge Libby.

1  Based on the information you provided at that hearing and based

2  on the information contained in your presentence report, I

3  accept your guilty plea here today.  Have you received a copy

4  of your presentence report?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  Have you read it and discussed it with

7  your attorney?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  Are there any outstanding objections or

10  corrections, Mr. Purnell?

11          MR. PURNELL:  There are, Your Honor.

12          THE COURT:  Okay.  You may proceed.

13          MR. PURNELL:  The -- let me just take it from the

14  main objection that we filed, and that's as to the base offense

15  level.  As you know from the PSR, this case involves the

16  transfer of what they call switches.  So switches are the small

17  pieces of plastic in this case.  Sometimes they could be made

18  of something else, but in this case they're made out of

19  plastic, so they're 3D-printed.  And then what you can do with

20  that is if, you know, when you receive that switch, you can,

21  you know, break down a firearm a little bit and then replace a

22  part, and then put it back together, and essentially it makes

23  the weapon automatic.

24          So that is what Mr. Espinosa was charged with.  That

25  is what Mr. Espinosa pled guilty to, understanding that this

1  was -- that this is a crime as described in the transfer and

2  possession of a machine gun not registered in the National

3  Firearms Registration or Transfer Record.  So when you take

4  that particular statute and you apply it to the guidelines, you

5  end up going to 2K2.1.  And then 2K2.1 then starts making some

6  -- or provides some options, I guess, depending on the nature

7  of the offense, kind of like most of our guideline provisions

8  do.  It starts super-duper bad, and then it kind of goes down a

9  little bit depending on what you have.

10         So 2K2.1, you know, the basic sort of, you know, the

11 worst-case scenario kind of deal, that you would get is a

12 Level 26 if it involved a semi-automatic firearm that is

13 capable of accepting a large capacity magazine, or, you know,

14 it just goes on like that; goes from 26 to 24, 22, 20, then

15 here, 18 is what was selected, is if the offense involved a

16 firearm described in 26 U.S.C. 5845(a).  And then if it wasn't

17 that though, there's 14 for prohibited persons and then 12,

18 except as provided below, meaning 12 is sort of like your

19 default catchall provision unless it's 6, which would be if a

20 defendant is convicted under 18 U.S.C. 922 and then this

21 section's here. By the way, we end up at Section 5, which gives

22 us a base offense level of 18.

23         Now, I was looking at it, and it says if the offense

24 involves a firearm described in 26 U.S.C. 5845(a), so I was

25 like, okay.  Having looked at a number of these cases, firearms

are described and defined differently in different sections or

different area, like different statutes call, you know, define

it one way, different rules define it another way.  So, you

know, well you look at the guidelines in 2K2.1 actually has its

notes and the commentary, and Application Note 1 is the

definitions for purposes of this guideline, this 2K2.1.  So if

you go down the definitions you get to firearm, and this is

under the first section, "has the meaning given that term in

18 U.S.C. 921(a)(3)."

So I went and looked at 921(a)(3) and put it in my

objection, but 921(a)(3) defines "it" as any weapon, "it,"

meaning firearm.

"Any weapon (including a starter gun) which will or

is designed to, or may readily be converted to expel

a projectile by the action of an explosive; (B) the

frame or receiver of any such weapon; (C) any

firearm, muffler, or firearm silencer; or (D) any

destructive device.  Such term does not include an

antique firearm."

None of those --

THE COURT:  And that comes from 28 U.S.C. 5845(a),

correct?

MR. PURNELL:  Right.  Well, 921(a)(3) defines it that

way.

THE COURT:  Right.

1          MR. PURNELL: So I'm -- so looking at it, what we're

2   talking about is these switches here, yeah?  So the switches

3   themselves are not firearms under this definition.  They're

4   considered firearms for purposes of what Mr. Espinosa pled

5   guilty to in a whole other statute, and he's fully guilty of

6   that; he's accepting full responsibility of that.  But when you

7   go the guidelines, and the reason you get to this 2K2.1 is you

8   go to the index and it tells you, you look at the offense, you

9   know, the statute of conviction, and it refers you in the index

10  to 2K2.1.  So 2K2.1 offers a whole plethora of different things

11  that are clearly not the switch, right?

12          Now, I understand how one might fall on 5 simply by

13  reading through real quick, but it does use the term firearm

14  very specifically in the guideline. and that term is defined as

15  I just described, and that is not what a switch is.  I mean, it

16  gives you some breakdown even.  It says -- I mean, if he had

17  been selling frames or receivers of these weapons, then sure,

18  then we'd be -- you know, we'd be looking at this provision,

19  but that's not what we're talking about.  What we're talking

20  about is the switch which is not the frame or the receiver, and

21  I think everyone agrees on that particular point.

22          So if it is not that, then what you would be left

23  with is 12 which is the -- except 12 -- except as otherwise

24  provided below and the otherwise doesn't apply here.  So I

25  think and our objection is, that looking at the guideline, the

1 guideline is layered the way it is because there's some things

2 that are just worse than others, okay?  Had he been actually

3 moving any weapon which will or is designed to, or may readily

4 be converted to expel a projectile by action of an explosive,

5 then yeah, he would fall squarely on 18, but that's not what he

6 was selling and that's not what he pled guilty to.  He was

7 selling to -- he was -- he pled guilty to the sale or the -- or

8 whatever, the transfer of these switches.

9         So instead of 18, you'd be left with 12, which sort

10 of makes sense when you think about it because by themselves

11 they're little plastic pieces and, I mean, actually gathered

12 the number of parts that we're talking about here before I took

13 out -- I left on a trip.  I'd gathered them and put them in a

14 little sandwich thing, not those parts because I don't have

15 those.  But instead, I did have some Lego pieces and it fit in

16 a sandwich bag, okay?  We're not talking about, you know, the

17 Lord of War essentially walking in here with his crate, you

18 know, with a hay-filled crate with a bunch of AK-47s in  it.

19 We're talking about these pieces that by themselves mean

20 nothing, okay?  Of course, I didn't bring it in because while I

21 was away, my 14-year-old daughter decided she wanted to be a

22 grownup and got rid of all of her Legos, so I don't have that

23 anymore.

24         But either way, the point is, it's not the same thing

25 as what's contemplated in 18, I don't think.  And really, all

that's being considered or we should be considering is base

offense what would be 12, specifically because we are in 2K2.1,

and 2K2.1 goes -- gives us -- goes to great lengths to give us

the firearm definition under 18 U.S.C. 921(a)(3) which does not

include the switches.  So I think it's -- and it kind of makes

sense I think because the switches by themselves, yes, it's bad

and that's what he pled guilty to; he understands that that's a

problem.  But is it as bad as, you know, saying you had a bunch

of guns and, no, that's very different, I think.  So you

wouldn't be, you know, punishing it the same way as you would

be punishing those people who were selling the firearm mufflers

or the silencers, the destructive devices, for example, like

the grenades that are referenced in the Government's response

to my objection.

        The case that they're relying on, that was actually a

grenade, and then there were a bunch of duds essentially that

were sold to the guy who was trying to get a bunch of grenades

to give to some other bad guys.  The issue in that case was not

whether or not it was 18 or it was -- sorry, Section 5.  The

issue in there was whether or not there were, you know, a

hundred-plus grenades or was it just one, because it was only

one live grenade.  And in that case, I did actually take the

time to read it, but you know, where it said that -- or the

Court was saying look, the problem here is that he sought to

buy, or what was sought to be bought was what was being

1  punished here as opposed to what was in fact bought, kind of
2  like in drug cases where, you know, you buy some drugs and then
3  the rest of it isn't really drugs.  But either way, they said
4  no, he was seeking to buy, you know, a hundred-plus
5  hand-grenades and yet, that's what he's being punished for.

6          Here, what we're talking about is only the issue of
7  whether or not it's this -- does it involve this type of
8  firearm to get it up to the 5, you know, the Subsection 5 which
9  will leave it at the 18.  So I think if that's -- if the Court
10 understands my interpretation of this, and unfortunately I just
11 don't think there's any cases on this because switches just
12 aren't -- it's kind of relatively new area and you don't really
13 see this issue being addressed because it just -- I don't think
14 this is the way it usually gets guidelined out so-to-speak, so
15 at least I didn't find any cases in that regard.  And I think
16 the case relied on by the Government, this Maturino case, just
17 is inapplicable because of what I was telling you earlier about
18 the hand-grenades.

19         And actually, the hand-grenades, it would be an 18
20 and it was an 18 in that case because, well, guess what?  It's
21 any destructive device.  I mean, it does fall under the
22 definition that's given to us for firearms under Application
23 Note 1.  Here we don't have that and I think there's a reason
24 for that.  Who knows, maybe at some point they'll decide, well,
25 these things are terrible and we need to kick it up that way,

1 but that's certainly not what they did when they drafted these
2 provisions.

3     So that's really the objection that we have to the
4 guideline calculation.  It has some effect on the rest -- the
5 other enhancements, so to speak, but really, just the starting
6 point I believe should be 12 based on what I've just said.

7     THE COURT:  Okay.  Mr. Dunn, response?

8     MR. DUNN:  Yes, Your Honor.  I -- with respect to the
9 written response the Government filed, I kind of tried to go
10 through the process of how the Court determines the base
11 offense level, and one of the things that -- the two things I
12 would point out to the Court are the relevant conduct section
13 of the guidelines, 1B1.3(a)(4), specifically notes that the
14 Court should consider the information specified in the
15 applicable -- this -- the applicable guideline.

16     So in this case, in 2K2.1(a) I would -- I pointed out
17 in my written response that (a) says to apply the greater of
18 these, so they do go in descending order as Mr. Purnell says,
19 but the guidelines specifically say pick the one that is the
20 greatest of all these that apply; so multiple could apply but
21 pick the greatest one.  The Maturino case that I cited and
22 Mr. Purnell has talked about, and he talked about it
23 accurately.  The reason I included that is if the Court looks
24 to the definition on the note under 2K2.1.1, they define
25 firearm.  It doesn't define destructive device.  So the only

1  way to get to a grenade as a destructive device is via the

2  other statute 26 U.S.C. 5845.  That's what defines a grenade as

3  a destructive device.  So there's -- the only way to get there

4  is through this other statute.

5        So because the guidelines point out that it's a

6  Level 18 if it's a firearm described in 26 U.S.C. 1845(a), I

7  believe that supersedes that note, supersedes the -- basically

8  the note, the Government's position with the note is a general

9  definition, but because the guidelines provide a specific

10 statute that that specific statute supersedes the definition

11 that's supplied therein.  And I think that's consistent with

12 the Diaz-Corado case that the Government cited as well, where

13 it says that the guideline -- the commentary in the guidelines

14 is authoritative unless it violates the constitution or a

15 federal statute, or is inconsistent with or plainly -- a

16 plainly erroneous reading of that guideline.  I think to limit

17 firearm to what is considered in the note, even though you have

18 another specific statute that it's pointing you to, is

19 inconsistent with a plain reading of what the guideline is.  So

20 I do think that the Level 18 is properly determined.

21        THE COURT:  So you think 5845(a) is where you get the

22 definition.

23        MR. DUNN:  Yes.

24        THE COURT:  And what portion of that, what section?

25        MR. DUNN:  So (a) describes -- (a) is what gives you

1 machineguns and then under 5845(b) is the definition of what

2 all constitutes a machinegun which includes the parts that the

3 defendant possessed in this case.

4        THE COURT:  So you would go under 6, a machinegun --

5        MR. DUNN:  Yes.

6        THE COURT:  -- because these items convert both the

7 Glock and the AR --

8        MR. DUNN:  Right.

9        THE COURT:  -- into automatic weapons.

10        MR. DUNN:  And that's consistent with the way it was

11 charged as well under 922(o), which is possession for transfer

12 or machineguns.

13        THE COURT:  Okay.  This is novel.  This is -- the

14 Court didn't find very much case law either on this.  The Court

15 will overrule the objection.  With that ruling the guidelines

16 are a total offense level of 25, criminal history category of

17 1, producing a range of 57 to 71 months.  Are these guidelines

18 correctly calculated after the Court's ruling, Mr. Purnell?

19        MR. PURNELL:  They are, Your Honor.

20        THE COURT:  Mr. Dunn?

21        MR. DUNN:  They are, Your Honor.

22        THE COURT:  And what is the Government's

23 recommendation?

24        MR. DUNN:  Your Honor, the Government's going to

25 recommend a sentence at the low end of the guidelines in this

case. That's primarily based off of the defendant's lack of criminal history, his young age. But the thing that the Court -- or that the Government would like the Court to take into consideration is, while he's being held accountable for, I believe, 37 of these items -- yes, 37 of them, based off of the statements that we had, as well as the factual stipulation the defendant signed, and according to his statements, he had been selling approximately, I believe, 300 of these items every three months and had been doing it for approximately three years. The Government was not able to corroborate those numbers independently. Therefore, he was only held accountable in this case for what we actually were able to recover at his house with a search warrant. It's also intercepting to the Postal Service. But I think it's important for the Court to note that that's exactly what he told law enforcement and agreed to in the signing of the stipulation.

Your Honor, these devices -- Mr. Purnell's right, they're very small. They don't look like much, Your Honor, but also as outlined in the factual stipulation, the defendant did create YouTube videos about how to install and use these devices, and specifically in the factual stipulation we talk about one YouTube video that he published wherein he shows you how to install one of the AR lighting links for the AR-15s. That process takes under one minute. And at this point I'll just read from the factual stipulation which is transcribed of

1  what he said in the video.  But once he places the lightning

2  link inside the firearm and then puts it back together, he says

3  the weapon is now fully automatic; as long as you're holding

4  the trigger down, it will keep firing continuously.  This is

5  illegal.

6          Your Honor, these devices are small.  They seem --

7  they look innocuous.  They can be installed in a minute or

8  less, and especially if you know what you're doing, and then

9  they can wreak havoc.  And so on the basis of how many -- not

10  just how many that we -- he's been held accountable for, but

11  also his statement, Your Honor.  I do think a guideline

12  sentence is appropriate in this case to reflect the seriousness

13  of this offense, Your Honor.

14          THE COURT:  Thank you, Mr. Dunn.  Mr. Purnell?

15          MR. PURNELL:  If I may just take it from the top.

16  The 300 items that he was selling is completely

17  mischaracterized.  It's, yeah, he admitted to doing 300 items,

18  but those items had such a broad array.  You know, the things

19  that I've seen are, yeah, like these little statutes, it's how

20  he got into 3D printing and that's really what he does.  And

21  then of course he's an enthusiast and he's learning all these

22  different things, and so he learned about how to print, or he

23  got these CADD designs that are available to literally anybody

24  out there, and it's not illegal for people to put those out

25  there.  It's not illegal to make a video and explain to people

1    how to do these things.  And that's how he learned.  But the

2    idea that he was selling 300 of these things every three months

3    for three years is just -- it's not what was going on in this

4    case, and I think it's disingenuous to suggest that that was

5    what was going on in this case or what he meant when he made

6    that statement to law enforcement.  That's not the context of

7    the statement, just didn't -- that's not what he said.

8            So putting that in -- that aside, Your Honor, I would

9    -- let me just back up to where we were earlier when we were

10   talking about my objection.  This is a -- it's an interesting

11   crime.  I would argue that it would have been a good one to try

12   perhaps, because I'm not entirely sure that it's as clear as

13   the Government would like to make it out to be without going

14   into too much detail about what I discussed with Mr. Espinosa.

15   I know that it was -- he was the one that explained this to me

16   and explained why it's a problem, you know, like why this is

17   actually a crime and, okay, I get it.

18           But it's really at the end of the day the printing of

19   a small part that is about as inanimate as it comes and can

20   really do nothing unless that part then gets placed in a

21   firearm and you put it in the firearm doing a number of

22   different things.  It's not like you can just kind of put them

23   together and it happens.  I mean, you literally have to go

24   through a bunch of steps to get there, which is what my concern

25   was looking at the cases and in understanding what you need in

1    order to have a "machine gun" when you're just talking about a

2    little piece.  I mean, just using common vernacular, it seems

3    kind of silly.

4         You know, this is a machine -- no, that's not a

5    machinegun, but the law says it is because of what can

6    eventually happen.  So -- and that was from Mr. Espinosa.  He's

7    the one that gives me that because I, you know, I -- I'm not as

8    -- I'm not that familiar with these particular pieces as a

9    normal common guy would have been sitting here.  I would be

10   like, that's not a machinegun, so I'm not going to convict some

11   guy of doing it, but he explained the law to me and I looked up

12   the law based on the explanation.

13        So I get that part, but there's a broad spectrum of

14   what he's actually been convicted of, or what he pled guilty

15   to.  Transfer or possession of a machinegun not registered in

16   the National Firearms Registration and Transfer Record.  That

17   covers the Lord of War who has got his crate and he's got his,

18   you know, AK-47s in there, and if we had to bring in 40 AK-47s

19   to match up the number of switches that were being moved, it

20   would look very different.  You'd have your little bag full of

21   Legos versus, you know, these crates, you know, sort of thing.

22   And I get it.

23        You know, just because it's smaller and it's not, you

24   know.  But I'll tell you what, you got a guy who knows how to

25   use a firearm, he's going to be able to pull out that AK-47 and

do some damage with it straight away.  It's going to take a

while, even though it takes only a minute if you have all the

parts and all that, you'd have to go get the other gun.  You'd

have to do a lot of other -- there's a bunch of stuff to need

to happen before it becomes as terrible as the AK-47s in a

crate.  So -- and I don't know if -- I think AK-47s would fall

into this.  I don't know -- again, I'm just showing my limited

knowledge on those issues, but it just seems that the spectrum

that we're talking about here is so broad, and what

Mr. Espinosa was up to is so different to the guys that are

actually moving these firearms, the ones that we usually are

talking about when we see these guns going south and we're

catching them.  Like the -- it's a very different animal.

Also, and I'll say just for the record, that there

was an opportunity and he did take the opportunity to visit

with some agents, and that was very recent unfortunately.  It

took a while for that to happen.  We just had some scheduling

issues.  But the -- you know, and he was more than candid with

the type of people he was dealing with.  And the type of people

he's dealing with, like police officers who are buying these

things in New York, and he actually had like this -- it's kind

of looks -- sounds silly, but like a law enforcement discount

he'd give them if they sort of proved that they were police

officers, because he was like, oh, you know, I mean, this is

fun.

1          He wasn't selling to, you know, cartels and things

2    like that.  He is a Second Amendment enthusiast.  He is a --

3    those are the groups that he chats with.  That's who we're

4    talking about here, and this has gone beyond the pale of the

5    Second Amendment, I suppose, because you know, this is sort of

6    where we are and probably rightfully so.  But it's not the kind

7    of extreme stuff that you consider and how you get to, you

8    know, the type of guidelines that we're looking at here which

9    is, you know, 57 months, is a long time for a lot of stuff.

10   I'm thinking the crates when I think the 57 months.  I'm not

11   thinking about my bag of Legos type of thing.

12         So I just kind of wanted to revisit that issue, and

13   now that the Court has overruled the objection, but the other

14   part that we're just sort of fallen from that is, if the

15   firearm definition was as I suggested, a lot of other things

16   would have happened to the guidelines.  It would have started

17   at a 12.  I think then if the offense involved three or more

18   firearms, we would -- or the specific offense characteristics

19   would not have been included either.  Like the number wouldn't,

20   I don't think have been included, and if the defendant engaged

21   in trafficking of firearms, increased by four levels, like we

22   have that one as well in this case.

23         So he's got, you know, additional ten points on top

24   of it -- or not ten points.  I guess it's four plus -- yeah, I

25   think it's ten points was what was added because of it, so

1  you're looking at a lot of points that are being added, getting

2  him up to 28, and then minus 3 gets you down to 25 because the

3  switch is considered a firearm, I think in contradiction to the

4  note, but I understand the Court's ruling on that.  So I feel

5  we're artificially -- for his conduct in this case and what he

6  was actually doing, I think the guidelines are, you know,

7  really over-punish for the conduct that was being -- that

8  happened in this case.

9        So that being said, we're -- so we're not looking at

10  a 12 and we're actually looking at the 25 that was really where

11  we ended up after the acceptance of responsibility, and I think

12  that's just a difficult position.  So, Mr. Espinosa did plead

13  guilty.  He did waive his right of appeal when he pled guilty.

14  He is a young, young man and I think a lot of his decisions

15  were probably in part due to his age, may have a little bit to

16  do with his mental health issues that are described in the

17  presentence report.  His education isn't as advanced, shall we

18  say, as other people, and he spent a fair amount of time, or a

19  lot of time, actually about a year now, in a short-term, you

20  know, detention facility which I think is very difficult.

21        What he does have is an enthusiasm and a sort of

22  joie de vivre that you don't find in a lot of people.  His

23  mother is here.  She's got her own issues of course, and I'd

24  submitted to the Court along with the letters, and I don't want

25  to just be talking about that on the record, but I think it's

1   clear enough in what we submitted.  He has -- his half-brother

2   who's really his brother-brother, you know, as far as he is

3   concerned, and a dog that he loves and he misses.  And I'm -- I

4   just -- I suffer at the thought of already this year that he's

5   been away but, you know, to think about him, you know, almost

6   another, you know, four years to this based on what we've been

7   talking about here and what we know about this case, I think is

8   a little bit difficult and hard to swallow.

9           I just don't know what to ask the Court in terms of a

10  sentence.  You know, if the objection had been granted I think

11  I'd be in the sort of a time served range.  I -- I'm going to

12  leave it to the Court's, you know, good judgments and thoughts

13  on that.  I'm afraid you don't have much more experience than

14  any of us on sentencing these cases.  I know just kind of

15  glancing around the country at the different sentences that we

16  see, they're never up in this 57-month range from what I could

17  tell of the switch sellers.  It's a, I mean, not even half of

18  that, so I just have a hard time or a difficult time really

19  suggesting anything without seeming to disrespect what's going

20  on here because I think it is incredibly serious, but at the

21  same time I think this grossly overstates what was going on and

22  where this should end up.

23          THE COURT:  Thank you, Mr. Purnell.  Mr. Espinosa, is

24  there anything you would like to say to the Court?

25          THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  You may proceed.

2          THE DEFENDANT:  I would like to apologize for the

3   damages to my mother.  It's been a burden on her.  She has a

4   lot of stress because of this.  And the Court -- I'm sorry.

5   Thank you.

6          THE COURT:  Thank you, Mr. Espinosa.  The bottom end

7   of the guidelines is 57 months.  The Court will vary downward

8   based on the defendant's lack of criminal history, his waiver

9   of his right to appeal, as well as mental health issues which

10  are stated in the PSR.  The Court will sentence the defendant

11  to 33 months; custody to be followed by three years of

12  supervised release, in addition to the mandatory and standard

13  conditions; community service, is required to perform 75 hours

14  of community service to be completed by the third year of

15  supervision.  Computer education and mental health requirements

16  as set out in the appendix to the PSR will be ordered, as well

17  as substance abuse treatment and testing as set out in the PSR

18  as well.  There will be no fine; restitution is inapplicable.

19  There is a $100 special assessment which must be paid.

20          The Court has considered the advisory guidelines and

21  the sentencing factors set forth in 18 U.S.C. 3553.  The Court

22  finds that the sentence imposed is sufficient and not greater

23  than necessary to impose an appropriate sentence.  Again, your

24  client has waived his right to appeal, Mr. Purnell.

25          MR. PURNELL:  He has, Your Honor.

1        THE COURT:  And there are additional counts to be

2   dismissed?

3        MR. DUNN:  Your Honor, at this time, the Government

4   has dismissed Counts 2 and 3.

5        THE COURT:  Counts 2 and 3 against the defendant are

6   hereby dismissed.  Any requests concerning placement,

7   Mr. Purnell?

8        MR. PURNELL:  As close to Corpus Christi as possible,

9   Your Honor.

10        THE COURT:  The Court will make that recommendation.

11        MR. PURNELL:  I do have one comment though, Your

12   Honor.  You mentioned something about the computer -- you said

13   computer education.  What I had seen in the appendix is a

14   computer prohibition.

15        THE COURT:  Yes.

16        MR. PURNELL:  So we would have objections to that.  I

17   didn't know we were there yet.  My concern is -- so when he

18   comes out he's going to be going on supervised release, and we

19   wanted to get a job and do all these different things.  The way

20   this is written it would be literally impossible for him to

21   have a job, make a doctor's appointment, apply for a benefit.

22   I mean, nothing like that would be --

23        THE COURT:  Unless approved in advance by the

24   US probation officer.  So if he has -- if he is going to be

25   working on the computer as long as it's approved by his

1 probation office -- officer --

2          MR. PURNELL:  Okay.

3          THE COURT:  -- as long as they can come to an

4 agreement on it, he can apply with that.

5          MR. PURNELL:  Okay.

6          THE COURT:  Would that be correct, Mr. Garcia?

7          MR. GARCIA:  Yes, Your Honor.  I think that portion

8 of that special condition is what we were going to recommend to

9 the Court.  That would alleviate issues with (indiscernible -

10 the Defendant.

11          MR. PURNELL:  Okay.

12          THE COURT:  So let's make sure the judgment is

13 written up that way.

14          MR. GARCIA:  Yes, Your Honor.

15          THE COURT:  Thank you.  Anything further,

16 Mr. Purnell?

17          MR. PURNELL:  I don't think so.  May I have moment

18 just real quick?

19          THE COURT:  Yes.

20      (Counsel and Defendant confer)

21          MR. PURNELL:  Nothing.  Thank you.

22          THE COURT:  Very good.  Then the defendant is

23 remanded.  Mr. Purnell, you are excused.

24          MR. PURNELL:  Very well.  Thank you, Your Honor.

25          THE COURT:  Thank you.

1      MR. DUNN:  May I be excused as well, Your Honor?

2      THE COURT:  Yes, Mr. Dunn.  Thank you.

3      MR. DUNN:  Thank you.

4   (Proceedings concluded at 4:25 p.m.)

5                      * * * * *

6

7

8

9

10

11

12

13

14            **C E R T I F I C A T I O N**

15

16      I, Alicia Jarrett, court-approved transcriber, hereby

17   certify that the foregoing is a correct transcript from the

18   official electronic sound recording of the proceedings in the

19   above-entitled matter.

20

21

22

23   _____

24   ALICIA JARRETT, AAERT NO. 428      DATE: April 7, 2023

25   ACCESS TRANSCRIPTS, LLC